BROWNING, C.J.
Anthony Yusufu Oyibo (Appellant) appeals his convictions of first-degree murder of a child under 18 years of age, during the commission of a felony (aggravated child abuse by shaking and/or inflicting blunt trauma); aggravated child abuse of Anyah Hayes, who was under 18 years of age, by inflicting blunt trauma to the victim’s head; kidnapping of Deven Marshall, a child under age 13; armed burglary of a building, the property of Don and/or Carol Racine, with the intent to commit an offense (theft) and while armed *602 with a dangerous weapon (a flare gun); attempted armed robbery of Greg Novo-sad involving an attempt to take the victim’s truck, during which Appellant carried a deadly weapon (a flare gun); and armed carjacking of Brenda White while carrying a deadly weapon (a flare gun). After receiving the jury verdicts of guilty, the trial court adjudicated Appellant guilty and sentenced him to a prison term of natural life without the possibility of parole on the murder conviction, with the terms of incarceration on the remaining counts all to run consecutively to one another.
The sole issue on appeal is whether the trial court abused its discretion by admitting evidence of other crimes, wrongs or other acts under Williams v. State, 110 So.2d 654, 663 (Fla.1959) (stating that “evidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion”). This case arose from a familial environment created by Appellant and Ms. Gergely, the mother of the minor children, who were the victims of the crimes for which Appellant was convicted in part. As background information, harm done to the minor children at the time charged could have been perpetrated only by either Appellant or Ms. Gergely, as no other individual was implicated at trial.

Facts and Background

The six-hour crime spree for which Appellant was charged commenced on May 6, 2003, at approximately 3:00 p.m., when Appellant was awakened by the children’s crying and playing in the apartment. Apparently, irritated by the children’s actions, Appellant ordered Ms. Gergely (his live-in girlfriend) to go into the bathroom, and he shut her in there. Soon after this, Appellant opened the bathroom door as he carried little Anyah (Ms. Gergely’s daughter) by the back of her shirt and shoved the child at Ms. Gergely. After Appellant shut the door again, Ms. Gergely heard at least two unusual, booming noises outside the door.
Although the specific timing of these two crimes on the afternoon of May 6, 2003, is unclear, the prosecution presented evidence that Appellant committed the first-degree murder of 4-month-old Jacob Oy-ibo (the son of Appellant and Ms. Gergely) while brutally shaking the baby and/or inflicting blunt force trauma; and committed aggravated child abuse upon 16-month-old Anyah Hayes (Ms. Gergely’s daughter from a different relationship) by striking the baby’s head against the wall at least twice, all of which occurred in the apartment where they lived. Appellant next attacked Ms. Gergely, threatening to kill her and trying to choke her with an electric cord. Ms. Gergely escaped and called 911 from a neighbor’s house.
After Ms. Gergely left the apartment, Appellant left the apartment in a hurried and agitated state, dragging Deven with him toward a nearby boat repair business. Apparently, Appellant and Deven hid in a boat for the remaining daylight hours. Early that same evening, Greg Novosad visited Mr. and Mrs. Racine’s boat repair facility, which was fenced and gated and closed for the night. Around 9:00 p.m., after the gated was closed, Mr. Novosad heard someone starting the engine of his truck and observed his vehicle moving in reverse. Noticing that the gate was open again, Mr. Novosad ran outside and had nearly closed the gate when Appellant tried to ram the truck through the gate. The impact stalled the vehicle, and Mr. Novosad reached inside the passenger’s side and pulled on the person seated there, a young boy. Appellant told Mr. Novosad to leave the child alone because Appellant had a gun. Mr. Novosad backed off. *603 Meanwhile, Mr. Novosad’s girlfriend, Brenda White, had driven onto the premises to meet him and the Racines. Appellant exited the truck, ran over to Ms. White’s car, yelled for her to get out, and grabbed her hair and threw her to the concrete pavement. Next, Appellant returned to Mr. Novosad’s truck, removed the boy, and returned with him to Ms. White’s car. Appellant shot a flare gun (stolen from one of the boats at the facility) into the back of the truck and told Mr. Novosad to put out the fire that resulted. Appellant fled with Deven in Ms. White’s car and was apprehended a day later in the Vero Beach area.
At trial, the State introduced, through Ms. Gergely’s testimony, violent acts committed on Jacob and Anyah a few days before May 6, 2003. She testified that Appellant wrapped plastic bags around the heads of Jacob and Anyah, picked them up with the bags, and dropped them to a mattress on the floor. Ms. Gergely testified the children were not injured; and she did not seek medical attention for them or call the police. Also, the State elicited from Ms. Gergely the following testimony:
Q. Ms. Gergely, I just want you to answer this yes or no. Would the defendant during the course of your relationship ever get angry with you?
A. Yes.
Q. And again just yes or no. Was it obvious to you when he was?
A. Yes.
Q. Another yes or no question. In the week or so prior to Jacob’s murder, did you leave your home for a couple days? Just yes or no.
A. Yes.
Q. Did you take your children with you?
A. Yes.
Q. All your children?
A. Yes.
On redirect, Ms. Gergely was questioned as follows:
Q. That’s okay. Back when these incidents happened, how much did you love “Bubba” around that time?
A. I loved — I loved him. He’s the father of my child.
Q. You didn’t hurt your children?
A. No.
Q. And back in the early days around this incident and afterwards, did you believe “Bubba” hurt your children?
A. I didn’t want to believe that.
Q. Did you also ask “Bubba”, when you wrote him, what happened that day? A. Yes.
Q. Because you didn’t know, did you, yourself? Did you know what happened that day?
A. No.
Q. In your mind, who was the only person who knew?
A. “Bubba”.
Q. When you wrote him, do you remember asking him why he, quote, beat the shit out of you that day?
A. I could have asked him that.
Q. Show you what’s been marked as Quadruple Y for identification. Is that one of your letters?
A. Yes.
Q. And does that refresh your recollection about whether or not you made any statements to him about him beating the shit out of you that day? Excuse my language.
Defense counsel objected to admission of all of the foregoing dialogue testimony and moved for a mistrial, which the trial court overruled. From this ruling, Appellant argues that the trial court reversibly erred *604 and that Appellant is entitled to a new trial. We disagree and affirm.

Analysis

We conclude that Appellant has not met his burden to show an abuse of discretion in the trial court’s denial of his motions for mistrial. This is because “inseparable crime” evidence is admitted, not because it shows a defendant’s commission of other crimes or because it relates to character according to section 90.404(2)(a), Florida Statutes (2003), but because it is a relevant, inseparable, and contextual aspect of the act that is at issue. See § 90.402, Fla. Stat. (2003); Hunter v. State, 660 So.2d 244, 251 (Fla.1995); Austin v. State, 500 So.2d 262, 265 (Fla. 1st DCA 1986); Gorham v. State, 454 So.2d 556, 558 (Fla.1984); Charles W. Ehrhardt, Florida Evidence § 404.17 & nn. 10-11 (2007).
Even assuming arguendo that these two sets of statements are subject to the Williams Rule, we conclude it is still admissible. One theory of the defense was that it could have been Ms. Gergely, and not Appellant, who killed Jacob and abused Anyah. Therefore, the trial court correctly found the challenged testimony relevant and admissible to show identity, intent, premeditation, state of mind, and absence of mistake. See Foster v. State, 679 So .2d 747, 753 (Fla.1996); King v. State, 436 So.2d 50, 54 (Fla.1983). It is relevant also to show the entire context from which Appellant’s criminal conduct on May 6, 2003, arose. See Austin, 500 So.2d at 265.
Moreover, even if we conclude that the trial court erred in either of these rulings, there is no reasonable possibility that the error affected the verdict; that is, any error would be harmless under the circumstances. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
For all these reasons, we AFFIRM Appellant’s convictions and sentences.
BARFIELD and DAVIS, JJ„ concur.